Argued December 31, 1929; affirmed March 18, 1930

# LIPMAN OIL CO *v.* SCHWIND ET AL.

(285 P. 1025)

382

*Lamar Tooze* of Portland (J. G. Arnold and Jaureguy & Tooze, all of Portland, on the brief) for appellant.

*V. V. Pendergrass* of Portland for respondent.

ROSSMAN, J.  Jacob Schwind purchased these 40 shares of corporate stock in 1925, and remained owner of them until adversity overtook him.  At that time he transferred them to his wife and at approximately the same time the bank sued him upon his promissory note.  Mrs. Schwind claims that the transfer to her was bona fide and supported by the consideration of an antecedent debt.  The bank contends that the assignment to the wife was made for the purpose of defrauding Schwind's creditors.  Apart from the testimony of Mr. Jubitz, one of the officials of the bank who did no more than produce the note, the only other witnesses in this suit were Mr. and Mrs. Schwind.  The latter, to whom we may refer as the claimant, insists that this testimony substantiates her claim; the bank asserts that this testimony does not possess enough cogency to defeat its rights as an attaching creditor.  It argues (1) that the transfer to Mrs. Schwind is not supported by any consideration, (2) that if the evidence discloses any consideration it is an antecedent debt, which it contends, cannot support a transfer of this character, (3) that since the transfer to Mrs. Schwind was never registered upon the stock records of the oil company it is void as to the bank.  We shall express our opinion in regard to the first and second contentions only.

In 1893 Jacob Schwind and the claimant became husband and wife; the latter apparently was possessed of no estate, while the former, according to the claimant, "had a little money—I don't know exactly how much, but he had a few thousand dollars." In addition he was the owner of a shoe repair establishment. Mrs. Schwind at once took up her household duties, and there is no evidence that she ever engaged in any occupation, or had any source of income, except that derived from her husband. She testified, it is true,

that at times she rented rooms in the family home, but since the latter was modest in size and since she did not mention the amount thus earned, we assume that it was inconsequential. Through close attention to the business and economy at home a small competence was created as time passed on. In the latter part of 1918 Mr. Schwind began to invest the savings in the preferred stocks of various corporations. Mrs. Schwind testified that these securities were paid for with "the money which Mr. Schwind had accumulated and saved during the time we were married." It is agreed that Schwind was the owner of the shoe repair shop; it was the profits of this business which produced the savings above mentioned. By 1920, $10,000 of such stock had been purchased. Each purchase was made by Mr. Schwind and the money that paid for it came out of bank accounts carried in the names of both. Apparently the claimant was not consulted before these purchases were made and never possessed any of the securities. Mr. Schwind had the certificates for $8,000 of this stock written in the joint names of his wife and himself. A certificate for $1,000 of stock in the Quaker Oats company showed that Schwind was its owner, and another certificate, also for $1,000 in the same company, carried the name of Mrs. Schwind as owner. Both Mr. and Mrs. Schwind testified that each of them owned in equal shares this stock and the bank balances. The title to a piece of property, which had been the family home for many years, was vested in the name of the husband. This city lot was improved with three houses and was valued at $15,000 by Mr. Schwind in 1927. The above described real property, the shares of corporate stocks, the two bank accounts, and the shoe repair establishment, comprised all of the assets of the two in 1920.

In the fall of 1921 Mr. Schwind retired from his business and in the year 1925 began to speculate in the stock market. His activities between the two years just mentioned are not disclosed by the testimony; he testified, however, that in that period of time he occasionally disposed of some securities and purchased others with the proceeds. At those times he did not consult with his wife and frequently took the certificates in his individual name. Mrs. Schwind willingly signed the necessary instruments to enable him to handle these transactions. As above stated Schwind began to speculate in stocks in 1925. His wife testified that she was not aware of this fact at that time and her husband gave like testimony. However, we notice that when he began to narrate, as a witness, his operations as a speculator, he testified that he told her "I was buying different stocks to keep myself busy, doing something else." Apparently by the latter part of 1927 Mr. Schwind had suffered severe losses. In November of that year he resorted to loans upon policies of life insurance in an effort to save himself from further losses. Upon one policy $1,075 was obtained, and upon another $1,100; in the one his wife was named beneficiary, and his life was the subject-matter of the policy; in the other the reverse of this situation was the fact. Prior to that time Schwind had pledged with his broker as security for his marginal account much of the corporate stock which he had purchased prior to his speculative ventures. December 2, 1927, he applied to the Security Savings & Trust company for a loan. Upon that day he obtained $500 from the bank upon his unsecured note; December 5, 1927, he obtained $1,500 more in a like manner. April 25, 1928, when he was unable to pay these two notes, he executed a renewal note for $2,000. This is the note which became the subject-matter of the action previously mentioned.

In January of 1928 the brokerage firm failed; this incident brought him further loss and also brought to a close his speculative operations. At the time of its failure, this firm held as security for his marginal account the only stock which he still owned as a part of the purchases which he had made prior to 1925. When he was unable to pay the firm's demands this stock was sold and there remained available for him only $400 which his wife collected. In the meantime the two bank accounts had been exhausted, and apparently all of the stock, above mentioned, was dissipated except the forty shares of oil stock. The real property remained unencumbered.

October 30, 1928, the bank sued Schwind upon his $2,000 note and served a writ of attachment upon the secretary of the Lipman Oil company, whose books at that time, as previously indicated, showed that Schwind was the owner of forty shares of its capital stock. After the oil company had made a return to that effect, Mrs. Schwind made a demand upon it for this stock. As the result of that demand this suit was instituted by the oil company.

Mrs. Schwind supports her claim to the ownership of this stock with the testimony previously reviewed to the effect that she was a half owner of the $10,000 of securities purchased prior to 1925 and a half owner of the two bank accounts; that she was unaware of her husband's stock market operations and had not authorized him to dispose of her stock for his account; that as the result of his alleged wrongful appropriation of her property he became indebted to her for its value; that when she discovered the loss of her property she insisted that he make restitution; that Mr. Schwind acknowledged he was indebted to her, and, in an endeavor to secure its payment, assigned to her twenty

shares of this oil stock July 15, 1927; that on June 2, 1928, he assigned to her the remaining twenty shares; that when the latter assignment was made it was agreed that these shares, together with the first group of twenty shares, should constitute part payment of her claim; that at the same time he gave her a deed for the real property, as further part payment of her claim; and finally she insists that she also has a claim for repayment to her of half of the amount borrowed upon the policies of life insurance.

Schwind's testimony was intended to corroborate that of his wife in support of her claim. He testified that after he had disposed of the stock in which she was entitled to a half interest "the understanding was that she was to get the stocks back or the equivalent." He added that when he transferred to her the forty shares of the oil stock he believed that his failure to return the preferred stocks, purchased prior to 1925, had created a debt in her favor. Neither he nor the claimant kept any account books whatever concerning these various stock transactions. Neither was able to state the precise amount of Mrs. Schwind's claim; when pressed for an answer Schwind replied: "Oh, I don't know; but at that time I owed her about six, seven, eight thousand dollars * * * I haven't figured it up." The claimant was also reluctant to estimate the amount of her claim, but finally answered: "It figured up maybe eight or ten thousand." She had previously testified that she paid no attention to her husband's transactions relying, as she stated, upon his sense of fairness. Manifestly if the losses were shared by both, Mrs. Schwind would have no claim upon these forty shares of oil stock. She testified that under the arrangement between her husband and herself she was entitled to share in the profits, but that he

alone must incur the losses sustained in this stock speculation venture. Schwind corroborated her in the latter contention by testifying "I suffered the loss"; but, when asked whether his wife was entitled to share in his profits, replied: "I would have done it or I might not; I might would have done it, yes; it all depends on."

When Schwind obtained the loan of $1,500 from the bank he presented to it a statement revealing his financial condition which sets forth that he was the owner of these forty shares of oil stock. An inquiry in this statement concerning his open accounts he answered by writing "none"; his "total liabilities" he listed as $500, that being the amount of his $500 note executed three days previously.

If the contentions of the Schwinds are true Mrs. Schwind is now the sole owner of the real property and also of the forty shares of stock while Mr. Schwind has become entirely divested of all of his property. The forty shares of stock were valued by Schwind at $2,000 at the time he obtained the bank loan; the real property at the same time was valued at $15,000 and is unencumbered. Both Mr. and Mrs. Schwind testified that the latter could not now (fourteen months later) be sold for more than $8,000.

If Schwind was not indebted to his wife when he transferred to her this oil stock it seems clear that her claim to it must fail. When that transaction occurred his operations upon the stock market were in a precarious condition and she admits knowledge of that fact. For instance, she concedes that in September of 1927 friends had informed her that his losses were severe, and she willingly testified that before the assignment of the stock to herself she and her husband had borrowed on the life insurance policies in an effort

to prevent further losses, or, to use her own words, so that "he could save himself." Clearly, if the transfer of this stock to Mrs. Schwind was not supported by a consideration it is invalid under sections 10169 and 10170, Or. L. Since both the Schwinds concede that no new consideration was given at the time of the transfer of the stock they are compelled to rely upon some antecedent debt as the consideration for the transfer. Such a debt, they contend, is shown by the evidence we have reviewed. The statutes of this state regard an attaching creditor as a bona fide purchaser for value; section 301, Or. L.

██ Twenty shares of stock were assigned to Mrs. Schwind before her husband borrowed from the bank; both agree that that transfer was intended as security only. The weight of authority holds that a pledgee, who takes corporate stock as a mere security for a pre-existing debt, is not a purchaser for value within the rule that protects such purchasers against the existing equities of third parties in the stock: *Millard v. Green,* 94 Conn. 597, (110 Atl. 177, 9 A. L. R. 1610, annotated). That rule we believe is sound. Hence, this alleged pledge can not constitute the foundation of any claim in favor of the claimant to this stock; her rights, if any, must be determined from the day of the alleged agreement to the effect that she should take the forty shares as part payment. It was not until after the bank had loaned Schwind $2,000 that he told his wife she should take these securities as part satisfaction of her alleged claim.

The findings of the circuit court hold that this transfer "was without consideration and made with intent to hinder, delay and defraud the Security Savings & Trust company as a creditor of said Jacob Schwind."

After a painstaking examination of the testimony we find ourselves in accord with the circuit court's conclusions. Testimony in support of a transaction of the type, which the Schwinds say occurred, must be reasonably satisfactory or the transaction will fail. "A husband's conveyance to his wife is presumptively fraudulent as against existing creditors, and the wife has the burden of proving that it was made for a valuable consideration, in good faith, and without intent to defraud such creditors": *Hillsboro National Bank v. Garbarino,* 82 Or. 405 (161 P. 703). See also *Jones v. Beers,* 118 Or. 317 (246 P. 711), and *Marion Automobile Co. v. Brown,* 127 Or. 551 (272 P. 914). Transfers from a husband to his wife upon the eve of the husband's financial ruin are always closely scrutinized by the courts when their validity is challenged by defeated creditors.

If Mr. Schwind's transactions in these securities did not create a debt in favor of his wife there is no antecedent debt available as support for his transfer to her. Such a debt was created only (1) if the wife was a one-half owner of the stock bought prior to 1925 and of the bank accounts, and (2) if Schwind's subsequent disposal of this stock was unauthorized and amounted to a wrong against her estate. While we are willing to accept as true the first of these two propositions, yet even it is not supported by unequivocal testimony. Schwind didn't seem entirely certain why he had his wife's name inserted in some of the stock certificates as owner or part owner; we shall briefly review his explanations. In regard to one block of stock he testified that it was issued in the joint names of both "because she was entitled to half of our earnings;" next he explained that he didn't always follow this precept because "as long as I was in business, I looked for

the credit part" and, therefore, had some of the stock issued in his individual name; next he added: "why, it belonged to me, and then I had it assigned to Mrs. Schwind, so if I dropped dead tomorrow, she will have it." When asked concerning the oil stock "why did you take it in your name" he replied:

"I didn't consider it; I could sign it over to her; I didn't have to.

"Q. Why did you take it in your name?

"A. I took it in my name,—never gave it a thought."

In another part of his examination he was asked:

"You carried them in your own name because you wanted to use it as a basis for credit; is that right?

"A. Yes.

"Q. And at the time you carried it in your name for that purpose, you alone owned it, is that right?

"A. Yes.

"Q. Now, what distinction do you draw between those which you purchased in both of your names and those which you purchased in your own name? How do you divide it?

"A. I don't understand you. What distinction I should make? I simply owned that, and the other we owned together.

"Q. How did you happen to own that? The money all came out of the business, didn't it.

"A. Yes.

"Q. Why did she own one part of it, and not all of it?

"A. Because I told you, I borrowed money of Mr. Jubitz before, and I gave him a certificate in my name, without causing any difficulties if anything would happen, that he could just simply turn them over, and Mrs. Schwind would have an equity in it at that."

When Mrs. Schwind was asked whether she knew her husband was investing the savings "and taking

stocks in his own name" she replied: "Well, when I knew that he said he had it in his own name, I didn't think anything of that."

From the foregoing testimony it is evident that when Schwind purchased stock and designated in whose name the certificate should be issued he was prompted by various considerations, and that Mrs. Schwind "didn't think anything of that." The foregoing testimony is quite unsatisfactory as the foundation of a claim adverse to a creditor who has given credit upon the husband's written representation that he owned these forty shares; nevertheless we shall assume that the wife owned one-half of the securities purchased prior to 1925.

■ We come now to the contention that Mrs. Schwind owned half of the sums in the two bank accounts; in 1925 the balances were between three and four thousand dollars. The mere fact that the accounts were carried in their joint names does not prove ownership in both, although it shows that the deposit could be withdrawn by either: *Burke v. Slattery,* 10 Misc. Rep. (N. Y.) 754 (31 N. Y. S. 825); *Main's Appeal,* 73 Conn. 638 (48 Atl. 965); *Bath Savings Institution v. Fogg,* 101 Me. 188 (63 Atl. 731); *Main Savings Bank v. Welch,* 121 Me. 49 (115 Atl. 545); *Taylor v. Henry,* 48 Md. 550 (30 Am. Rep. 486); *Jones v. Crisp,* 109 Md. 30 (71 Atl. 515); *Noyes v. Institution for Savings,* 164 Mass. 583 (42 N. E. 103, 49 Am. St. Rep. 484); *Matter of Kline,* 65 Misc. Rep. (N. Y.) 446 (121 N. Y. S. 1090); *Godwin v. Godwin,* 141 Miss. 633 (107 So. 13). Although both testified that this account was jointly owned, there is no evidence that Mrs. Schwind ever made a deposit in either account; that she ever possessed the bank books or that she ever withdrew any

money from the accounts. Nevertheless, we shall accept as true the contention that the accounts were jointly owned.

■ We come now to the argument that when Schwind's operations in the stock market consumed the aforementioned securities and bank accounts he became indebted to his wife. This contention we are unwilling to say is true. If Mrs. Schwind was aware of his operations and authorized him to thus deal with her property in the hope that he would earn a profit for her, she can not make the loss of her property the basis of a claim in her favor. It is clear from her own testimony that she was aware of the fact that her husband was speculating in the stock market before he lost the securities. For instance she testified:

"It was sometime in the fall, or in the summer, I think, in 1927, when I was at the beach. Some friend told me, said, 'Did you know that Mr. Schwind is losing so much money?' and it shocked me so I couldn't believe it, and I didn't know how he could be losing the money, and I asked him, and he says, 'Well, in the stock market,' and I didn't know anything about the stock market. I knew that he bought bonds and stocks, and we got every three months our money, but I didn't understand anything about the stock market, so I investigated and found out that he lost the money, * * * *"

She then proceeded to narrate that her husband gave her the name of his broker, Overbeck & Cooke, and told her that these particular stocks, which constitute the foundation for her claim, were pledged as collateral with that firm. It is evident that she obtained the foregoing information prior to July 15 of 1927, because that is the date, when as a result of her alleged demand for security, the first twenty shares of oil stock were assigned to her. According to the testimony of

Mr. Schwind practically all of the stock purchased prior to 1925 was still in the custody of Overbeck & Cooke at that time. Hence, as early as July of 1927, while the stock was still intact, Mrs. Schwind was informed that not he, but Overbeck & Cooke possessed it, and that he was using it for an unauthorized purpose, if in fact the use was not in accordance with her wishes. Instead of demanding the return of the securities from Overbeck & Cooke we find her next borrowing money upon life insurance policies ''because I thought surely that would help him, and I would do it because he always was a good business man, and I trusted him, you see.'' It seems to us that this evidence indicates that after Mrs. Schwind became aware of the fact that her husband was using these securities as collateral for his marginal account she not only ratified his action, but encouraged him by enabling him to procure more than $2,000 of additional capital. We believe that in the middle of 1927, when Mrs. Schwind concedes that she obtained knowledge of her husband's speculations she regarded these operations in the same manner as his other efforts during their previous 34 years of married life in providing for his family. Under such circumstances losses like profits would be borne by the family estate. We do not believe that the evidence warrants any conclusion that when the wife discovered the losses she regarded her husband as her debtor or herself as his creditor. Possibly both feel now that his ill-advised venture in stock gambling, wherein he undertook to match a shoe maker's wits against the experienced, sharp intellects of other fortune-seekers, was a gross blunder and that he owes an obligation as a man and a husband to restore the family estate to the condition in which it was in 1925; but we do not believe that the elements are present

which create an enforceable debt. Such being our conclusions the alleged debt which the wife relies upon to sustain the transfer of the forty shares is not proved by the evidence.

An argument is advanced to the effect that since the money, which paid for the forty shares was taken out of the joint bank account, it follows that these shares are likewise jointly owned. While we have been reluctantly willing to believe that the bank account, as it existed in 1925, was jointly owned, it underwent many changes following that time. Schwind testified that his stock market speculations at times produced large profits. It may have been out of these profits that the forty shares were purchased. Since there is no proof that the forty shares were paid for with the proceeds of any security that the claimant owned, we must reject this argument as being unsound.

It follows from the foregoing that the decree of the circuit court must be affirmed.

Coshow, C. J., McBride and Rand, JJ., concur.