Argued April 12; affirmed May 17, 1949

LANGOE, AS ADMINISTRATOR *v.* GIANNINI

206 P. 2d 106

B. G. *Skulason,* of Portland, argued the cause and filed a brief for appellant.

*George L. Masten,* of Portland, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN and BAILEY, Justices.

ROSSMAN, J.

This is an appeal from a decree of the Circuit Court in favor of the defendant, Mrs. Ida Giannini, which held that she is the owner of "Savings Account No. 28522 in the Bank of California, N. A., and of the credit balance of $6,383.01 therein." The plaintiff, who is the appellant, presents the following contentions:

1. "The transactions relating to the joint account were of a testamentary nature and are controlled by the will of the decedent."

2. "The money in the joint account was the sole property of the decedent, the respondent having contributed nothing thereto."

3. "It was error to adjudge that the fund belonged to the respondent as survivor under the joint account."

4. "It was error to adjudge that the joint account was opened or maintained by the decedent with a donative intent."

When this suit was instituted, the parties to it were H. J. Langoe, administrator of the estate of one Jim Jimenez, deceased, as plaintiff, and the Bank of California, N. A., as defendant. Mr. Jimenez died June 24, 1947. The purpose of the proceeding was to secure judgment in favor of the appellant (plaintiff) for $6,330.07, being the amount which the complaint alleged the deceased had on deposit with the bank in a savings account. The answer of the bank alleged:

" * * * that various sums of money were deposited with the defendant in a joint savings account in the name and to the credit of one Jim Jiminez and one Ida Giannini; that on the 24th day of June, 1947, there was on deposit in said account the sum of $6,355.55; that said joint account is now credited with the sum of $6,383.01."

The answer of the bank disclaimed any beneficial interest in the deposited funds and, as the result of averments made by it in the form of a bill in interpleader, Ida Giannini, aforementioned, was made a party-defendant. In accordance with a stipulation of the parties and an order of the court, the bank paid to the clerk of the court $6,383.01 and was discharged as a party. From now on our use of the terms "defendant" and "respondent" will refer to Mrs. Giannini.

The answer of the defendant alleged:

"On or about the third of August, 1942, plaintiff's intestate and this defendant opened with the Bank of California, N. A., a joint account No. 28522 in the name of Jim Jiminez and Ida Giannini as joint owners thereof with right of survivorship. * * * That thereafter and prior to June 24, 1947, various sums at various times were deposited in said account by each of said co-depositors, and on July 24, 1947, there was on deposit in said account the sum of $6,355.55. That said account was and is a savings account, and on June 30, 1947, said bank credited to said account the sum of $27.46 as accrued interest thereon, and there is now a balance of $6,383.01 in said account."

The contentions which we have quoted give a sufficient indication of the issues which arose when the appellant filed his reply.

Mr. Jimenez, who was born in Spain, was 47 years of age at the time of his death. He was unmarried, had few intimates and pursued the occupation of a logger. He was industrious, and six savings accounts which he had at various times with Portland banks indicate that his habits were frugal and not profligate. His father in Spain and a brother in this county survived him.

About twenty-two years prior to his death, the deceased became acquainted with the respondent, who was born in Italy, but who, like himself, was a naturalized citizen. The respondent was married, had a son and a daughter, and resided with her husband at 1804 Southwest First Avenue in Portland. Her command of the English language had many limitations, and in testifying she was compelled to resort occasionally to an interpreter.

In the latter part of 1936 or the early part of 1937, Mr. Jimenez rented a room in the Giannini home at a rental of five dollars per month. Since his work as a logger was performed in the woods, he used his room only on occasional week-ends, at holiday periods and on the rare occasions when he lacked employment. Mrs. Giannini swore that, in addition to furnishing the deceased with a room for the modest rental of five dollars a month, she did washing for him, and added that he occasionally ate a meal with her family. Mr. Giannini was a cook, and it seems that the meals he prepared appealed to Mr. Jimenez. The five-dollar monthly payment sufficed for all purposes, but at times Mr. Jimenez supplemented the family larder with some articles that he purchased. The relationship between the Gianninis and the deceased was cordial. According to the respondent, ''He was just the same as a brother to us.'' It seems that Mrs. Giannini, to a greater extent than her husband, won the deceased's good will. She protested, however, ''Jim got nothing to do with me; it was just friend, good friend.'' She added, ''He trust me and I trust him.'' At one time when the Gianninis thought they ought to have a monthly rental of eight dollars, Mr. Jimenez' thrifty instincts caused him to rebel, but cordial relations were soon re-established and the decedent still had a room in their home at the time of his death.

June 16, 1942, the deceased purchased for a cash consideration of $2,500.00 a lot in Oregon City which was improved with a dwelling house. After he had made some betterments to the property he rented it to the son of the Gianninis at a monthly rental of $25.00.

July 27, 1942, Mr. Jimenez was accepted into the

United States Army with instructions to report August 11, 1942, for formal induction. February 26, 1943, he was honorably discharged. His induction into the Army caused Mr. Jimenez to realize that life has not only a beginning but also an end. Evidently he feared that his end might come before the conclusion of his war service and, therefore, made provision before his formal induction for the distribution of his bounty, in the event death overtook him while in the Army. Before reporting for induction, he called upon Mr. H. J. Langoe, the plaintiff, with whom he was acquainted, with a request that Mr. Langoe prepare for him a will. He told Mr. Langoe about his relatives, his enlistment in the Army and his wishes concerning the distribution of his estate in the event that he died while in the service. Mr. Langoe recommended that he employ an attorney, but after Mr. Jimenez had rejected that suggestion, Mr. Langoe yielded to the request and drafted a will. Its opening paragraph said:

"I * * * do hereby express my will and desire, with reference to my property, in case that I should die or come to my death while in the service of the United States Armed Forces."

Its next paragraph follows:

"In case that my death should occur, as hereinabove set forth, I hereby bequeath to my godson, George Frank Anderson, now two years old, as my legacy to him, when he shall become of legal age"

the Oregon City property. The drafted will contained no residuary clause. Its only other bequest is the following:

"Having otherwise, at this time, made arrangement with this my godson's grandmother, Ida

Giannini, residing at 1804 Southwest First Street, Portland, Oregon, for the management of my aforesaid property, in my absence, I want the provisions therein made, to be continued, in case of my death, and she to continue to have the right to dispose of and use the revenue derived from the said property for the upkeep of the said property, until my heir designate, George Frank Anderson, my aforesaid godson, shall have attained his legal age, when the property shall be formally passed to him for his own use and pleasure, and in case that her death should occur before my aforesaid godson becomes of legal age then the said property management arrangement and agreement, made with the said Ida Giannini, shall be transferred to and be continued by her daughter, Esther Anderson (nee Maffei), my aforesaid godson's mother, in a like manner as hereinabove set forth in my arrangement with her mother, the said Ida Giannini.

"Before leaving for the service herein described, I have, with the Bank, made authorization for the aforesaid Ida Giannini to be my agent also with reference to my bank account, and to deposit or withdraw money, as the case may be, and, in the event if my death should occur while I am in the service of the United States Armed Forces, I want her to have for her own use whatever money there should be to my credit as a small compensation for her work in looking after my affairs during my absence and for the hospitality that has been shown to me in her home during all of the time I have had a room in her home and during which time I have always been treated as a member of the said Giannini family. I have also given up my safety box in the bank and turned over for safe keeping such papers, bank book and belongings of value to me to the aforesaid Ida Giannini for her to keep for me, during my absence, in her safety deposit box."

Mr. Jimenez found that the drafted will was satisfactory and on August 4, 1942, executed it. On the same day he signed another document, likewise prepared by Mr. Langoe, which read as follows:

"Authorization of Property Management.

"This is my authorization to Mrs. Ida Giannini, that during my absence in the military service of the United States, she is to be my agent and in all respects act as manager of my residential property in Oregon City, Oregon, known as 'Lot 6, Block 2, C. T. Tooze Addition to Oregon City,' to rent the same, determinate tenancy, rerent and determine desirability of tenants, as the case may be, to determine the amount of rentals, to collect the rent, to determine and decide on any and all needed repairs and upkeep, to keep the property fully insured, to pay the taxes and assessments, if any, levied against the said property, and in all respects keep it free of any and all incumbrances; the money for these purposes she is to take from the monthly rental sums she collects from such tenants as she may make such rental agreements with, as to her shall be deemed satisfactory, and in case that the property should suffer any damage of any nature whatsoever, involving liability, the compensation for such damages as may be deemed proper and fair, shall, likewise, in my absence, be paid to my agent, the aforesaid Ida Giannini."

When Mr. Jimenez had signed those papers, he told Mr. Langoe, according to the latter's testimony, "If I should live and come back, then the provisions I am making in these respects are entirely cancelled, and I am going to destroy the will."

At the time of the execution of the two aforementioned documents, Mr. Jimenez possessed a savings account with the Portland branch of the Bank of Cali-

fornia which credited him with $305.35. The account was in his name. August 4, 1942, he and Mrs. Giannini went to the bank and signed a document reading as follows:

"Joint Account—Payable to Either or Survivor: Savings Account Number 28522.

"Jimenez, J. or Mrs. Ida Giannini, To The Bank of California, N. A.

"This bank accepts the joint account herein provided for under the following conditions, which are accepted by the depositors and constitute a contract between the bank and the depositors and/or each of them.

"Deposits entered herein are payable to either, or the survivor, and in case of the temporary closing of this account, you are hereby notified that a deposit thereafter by either is to be payable to either, or the survivor, unless the bank is otherwise notified.

"Each depositor is authorized to sign and endorse checks, notes, drafts or other commercial paper payable to the other, and deposit the same in this account, and each depositor is the general agent of the other for all purposes connected with the making deposits to this account or drawing checks thereon, and in case of overdraft by either, or overpayment to either, said overdraft or overpayment having arisen by error, mistake, inadvertence or otherwise, they are jointly and severally liable to the bank for said overdraft or overpayment."

Concurrently with the signing of that document, the bank, upon the request of Mr. Jimenez, terminated the savings account which we just mentioned; that is, the one which possessed a balance of $305.35 in favor of Mr. Jimenez, and transferred the balance to a new

savings account which it entitled "J. Jimenez and/or Mrs. Ida Giannini." Mrs. Giannini swore:

"Q. Did you go to the bank with him that day?

"A. Oh, sure, I got to sign some paper on a small card like that; and this man, before I sign it, this man there read it to him—he read this paper to him, and this paper said if he died, everything belonged to me; if I died everything belonged to him; he says so it's like that, so this man says, 'You sign there, Mrs. Giannini', and I sign that card there."

The new savings account book was handed to Mr. Jimenez who thereupon delivered it to Mrs. Giannini.

When Mr. Jimenez signed his will, the management document and the agreement for the joint bank account, he was the owner of two United States Defense Bonds, one of which had a maturity value of $100.00 and the other a maturity value of $25.00. The bonds bore his name as owner. August 4, 1942, he requested the Portland branch of the Bank of California to have the bonds changed so that the sums represented by them would be paid to Mrs. Giannini in the event of his death. On that day the Portland branch forwarded to the Federal Reserve Bank a written request, bearing Mr. Jimenez' signature, that the bonds be reissued so that there would be inscribed upon them: "Mr. Jim Jimenez, payable on death to Mrs. Ida Giannini, 1804 Southwest First Avenue, Portland, Oregon." The Federal Reserve Bank complied with the request and reissued the bonds.

Prior to the events we just described, Mr. Jimenez had kept his valuable papers, including his savings bank book, in a safety deposit box. After he had executed the documents we just described, he delivered

his bonds, will, management instrument and savings bank book to Mrs. Giannini, with a request that she procure a safety deposit box and place them in it. Mrs. Giannini complied with the request, procured a box and placed in it all of the aforementioned documents, but not the savings account book. She swore that she contantly had the book in her possession from that time on until Mr. Jimenez' death, with the exception of occasions when he obtained the book for the purpose of making deposits and in the period of twenty days prior to his death, when he obtained the book in order to make a deposit and inadvertently failed to return it to her. The deceased's death, which occurred in Longview, was sudden and unexpected.

It was in the manner above described that the joint savings account, which is the subject matter of this suit, was established. After the deceased had delivered his will, bonds, savings account book and management agreement to the respondent, he left Portland and was inducted into the Army. At that time, Mrs. Giannini assumed charge of the Oregon City property, and later received the commendation of the deceased for the manner in which she attended to his wishes.

We infer from Mrs. Giannini's testimony that the will and other documents were intended to serve three purposes. One of the purposes of the account, according to her, was to enable the parties to purchase a restaurant when a sufficient amount had accumulated in the account. Mr. Giannini, as we have said, was a cook in a Portland restaurant. A purpose of the writings was to afford the deceased a means of making a disposition of his estate in the event of his death. The third purpose was to interest Mrs. Giannini in Mr.

Jimenez' property during the time he was in uniform so that the property would be cared for.

According to Mrs. Giannini, the joint bank account belonged to her and Mr. Jimenez. She swore that she deposited money in it given to her by her husband. The appellant insists that testimony is false. Although we are suspicious of it, we can not say that it is false. Possibly the witness's difficulty with the English language placed her at a disadvantage. At times she protested she could not understand the cross-examining attorneys. The rent paid for the Oregon City property was sent to Mrs. Giannini and she deposited it in the joint bank account. At other times she placed in the account sums sent to her by the deceased. She made at least fourteen deposits in the account. She and Mr. Giannini had no bank account of their own. They owned a rental property and Mr. Giannini's monthly wages were $260.00. It may be that she did as she claimed; that is, deposited substantial sums in the account given to her by her husband. The respondent swore that Mr. Jimenez told her that she could withdraw money from the account whenever she wished. She, however, made no withdrawals, and explained, "I didn't need it."

January 21, 1944, that is, about eleven months after his discharge from the Army, Mr. Jimenez purchased, for the sum of $750.00, a United States savings bond, with a maturity value of $1,000.00, from the Portland branch of the Bank of California. At his request, the bank entered as the owners of the bond himself and Mrs. Giannini. The bond was delivered to her and was placed in the safety deposit box which we have already mentioned. She possessed it and the two defense bonds at the time of Mr. Jimenez' death.

In the early part of 1946 Mr. Jimeňez sold the Oregon City property for a sum which netted him $4,-300.00. He deposited that amount in the joint savings account which thereupon aggregated $5,807.96. About that time he told Mrs. Giannini to go to her safety deposit box and bring him his will. When it was returned to him, he threw it in a stove and burned it. Concurrently therewith, he explained that he no longer needed it. There can be no doubt that he destroyed the will in order to revoke it. When the deceased burned his will, he did nothing about the joint savings account except to continue it as before. According to Mrs. Giannini,

> "One time I ask him, I said to him, I said, 'Why not change your book and put it just in your name?' He said, 'No; I don't want to do that, because if anything happen, I leave it to you if something happen to me.'
>
> "Q. When did he tell you that?
> "A. So many times.
>
> "Q. Anybody else present?
> "A. No, because Jim never trusted nobody."

Likewise, when he destroyed his will he did nothing concerning his three bonds. It will be recalled that they were issued, at his request, in the joint names of the respondent and himself. It will also be recalled that, at his request, the respondent kept them in her safety deposit box.

We think that the facts above mentioned show that when Mr. Jimenez faced the possibility that he might be in the armed forces for a long time, he became concerned about the little fortune which his hard labor had enabled him· to accumulate. He had denied himself pleasures in order that he might have something which would take care of him in his old age—a pur-

pose which he had mentioned often to his friends. For many years he had deposited his savings in interest-bearing accounts, and eventually the savings were sufficient to enable him to purchase a rental property. His purchase of the property made him a landlord. His wealth was not great, but the security against want which it promised for his later years must have stood out in his drab life as a satisfactory achievement. But a house in the possession of a tenant requires attention upon the part of the owner, and, unfortunately for the deceased, his induction into the armed forces came shortly after he acquired the property. At that juncture he was confronted with the problem of finding someone who would give his property needed care. All of his friends, with the exception of Mrs. Giannini, were, like himself, loggers who came to Portland infrequently. None of them, so far as the record indicates, had had experience with real estate.

Until he won the friendship of the respondent, the deceased had spent his occasional Portland week-ends in various hotels. Since he was not a friendly man, his week-ends must have been lonesome and unsatisfactory. Even the silent record indicates that Mrs. Giannini is a positive character and of the vivacious type. Men who are cautious and dubious by nature generally find buoyancy for their sagging spirits in women of the positive, spirited kind. Adding more to the engaging qualities of Mrs. Giannini was the fact that she, like her friend, was born in one of the Latin countries. The foregoing renders significant the statement which he wrote into his will about the respondent and "the hospitality that has been shown to me in her home during all of the time I have had a room in her home and during which time I have always been

treated as a member of the Giannini family.'' From the day that the decedent secured a room in the Giannini home at the modest outlay of five dollars a month, he had something akin to a home. He kept his belongings there, and it was in the Giannini home that his friends called upon him. Whenever he returned to it he was greeted with a welcome and found within it opportunities for agreeable conversation.

Having in mind the above circumstances, we can readily understand why the decedent turned to the respondent for help when he found himself summoned for induction into the armed forces. She had gained his confidence, and he believed that she would give his Oregon City property needed attention while he was away. It was, in fact, Mrs. Giannini who suggested that he purchase a rental property. When Mr. Jimenez left for military induction there was $305.35 in his savings account. Partly for the purpose of enabling the respondent to deposit the rent money in that account and draw against it for necessary disbursements, he converted the account into a joint account. Not only did he render the account available to her, but he took an additional step: he wrote in his will that ''if my death should occur while I am in the service of the United States Armed Forces, I want her to have for her own use whatever money there should be to my credit.'' He also stated in his will the reason for that contemplated disposition of the savings account; it follows: '' * * * as a small compensation for her work in looking after my affairs during my absence and for the hospitality that has been shown to me in her home.'' It is true that the disposition of the fund, as stated in the will, was limited to the contingency of his death ''while I am in

the service of the United States Armed Forces'', but later, when he was discharged from the Army and had revoked his will, he did not attempt to terminate the joint bank account. To the contrary, as we have seen, he rejected a suggestion that the account be discontinued, and declared: ''No; I don't want to do that, because if anything happen, I leave it to you if something happen to me.'' In the meantime, the respondent remained the custodian of the bank book and from time to time he sent her money which she deposited in the account. We have also mentioned the fact that after his discharge he expressed his satisfaction with the manner in which the respondent managed the Oregon City property and, upon purchasing another Government bond, had her name inserted as a joint owner. From the time when the joint account was opened to the day he returned to civilian life the account increased from $305.35 to $531.14. More than four years passed after his return home before his death, and in that period the account grew from $531.14 to $6,-383.01.

The agreement with the bank, whereby the balance was rendered payable to the survivor, contained no restriction limiting the agreement to the period the deceased was in uniform. The will, which contains the only evidence that the joint account was limited to the period while the decedent was in uniform, was not a contract, and its reference to the joint bank account was nothing but narrative. Since the will upon being signed was placed in a sealed envelope with instructions that no one should open it until after death, it is clear that the respondent had not seen the paper. We are satisfied that if Mr. Jimenez, before leaving for induction, intended to limit the operation of the

account to the period while he was in the Army, he changed his intention after his discharge. As we have seen, he revoked the will which contained the sole reference to the limitation period. Since he destroyed the will by burning it, and since he had kept it in a sealed envelope, he very likely thought that the consuming blaze destroyed all evidence of his discarded intention. By continuing to permit the respondent to retain possession of the bank book and by treating her as a joint owner, he made it clear that he continued to deem her a joint depositor and that he wished the account to be hers if she survived him.

■ The evidence does not warrant conclusions that (1) before the deceased left for his training camp the respondent promised to care for the Oregon City property, (2) when the joint bank account was created she promised to deposit money of her own in it, or (3) he knew that she had made any deposits in the account. No one can acquire an interest in anyone else's bank account by depositing, without request, money in it. We have mentioned the respondent's testimony about her purported deposits, not because we attach importance to it, but because the briefs give it attention.

The evidence, however, indicates clearly that the deceased, upon leaving for induction, believed that the respondent would attend to the Oregon City property, and we are satisfied that he thought that if he would make her a joint depositor her interest in the property would not lag. The evidence also indicates that both before he went to the training camp and after returning from it, he felt such strong appreciation for the respondent's services and friendship that he wanted her to have a joint interest in the account and wanted her

to have title to the entire account if she survived him. In other words, he had what the law deems a donative intent. The record does not warrant a conclusion that the two entered into a contract whereby, in consideration of services to be rendered, the respondent was given title to the account in the event she survived the deceased, but it warrants a finding that he had the same donative purposes concerning the joint bank account as he had about his three bonds. We believe that the deceased made the respondent a gift of the interest, which we later specify, in the account.

The above is our review of the evidence and a statement of the inferences we drew from it.

■■ We believe that the decisions of this court state all of the legal principles which are necessary to dispose of the appellant's contentions. The mere fact that an account is entered in the ledgers of a bank in the joint names of two or more persons does not demonstrate that either of them is the owner of the account. Even when a bank, at the request of a depositor, enters upon its records the name of another person as a joint depositor, the latter does not thereby acquire title to the balance after the death of the active depositor: *Lipman Oil Co. v. Schwind*, 132 Or. 381, 285 P. 1025, are *In re Edwards' Estate*, 140 Or. 431, 14 P. 2d 274. The surviving depositor, upon asserting in himself ownership of the account, must establish his claim with proof.

■ Joint depositors may by agreement constitute themselves joint owners and confer upon the survivor the right to withdraw the entire balance as his own; see *Beach v. Holland*, 172 Or. 396, 142 P. 2d 990, 149 A. L. R. 866. In *Holbrook v. Hendricks' Estate*, 175 Or. 159, 152 P. 2d 573, a deposit agreement similar to the one

which the deceased and the respondent signed was termed ambiguous. The decision held that evidence is admissible to establish the intent and purposes of the parties whenever such instruments are ambiguous.

■ *Holbrook v. Hendricks' Estate,* supra, in which only one of the persons whose names appeared upon the deposit agreement as joint depositors had made a deposit, held that the fact that each was authorized to make withdrawals warranted an inference that an interest in the account was owned by each. Accordingly, in instances like the Holbrook and the instant cases, the contractual right of the survivor to make withdrawals is some evidence of his right to the fund.

In *In re Edwards' Estate,* supra, the account, unlike the ones in the Beach and Holbrook cases, was a commercial one, and both of the depositors had made deposits. The evidence had no tendency to vary the deposit agreement, but indicated that the parties wished, as the deposit agreement itself stated, that the balance should be paid to the survivor as his money. We gave the agreement effect. In *Beach v. Holland,* supra, the entire fund had been deposited by only one of the two whose names were entered in the bank records as joint depositors. The survivor had deposited nothing. The evidence satisfied the court that the active depositor had a donative intent when she entered the survivor's name in the bank records as joint depositor.

■ The mere fact that each depositor, during the lifetime of both, can make withdrawals does not suffice to establish a right in the survivor to withdraw the entire balance as his own. Whether the interest in the account comes by way of contract or by way of gift, so that during lifetime each can make withdrawals, the

survivor still must gain access to some principle of law whereby he acquires title to the entire fund upon the death of the other.

*Erickson v. Erickson*, 167 Or. 1, 115 P. 2d 172, *Beach v. Holland*, supra, and *Manning v. United States National Bank*, 174 Or. 118, 148 P. 2d 255, 153 A. L. R. 922, held that two or more persons, by contract, can create an estate by joint tenancy in either real or personal property. The distinguishing feature of joint tenancy is the right of the survivor to the entire estate. The Manning and Beach decisions each held that by contract the parties in those two cases had created a joint tenancy in a bank account. In each case the contract consisted largely of the joint deposit agreement, which was signed in the bank when the account was opened. Those agreements generally provide that upon the death of either of the depositors the balance shall be paid to the survivor.

█ We think that in this case, as in the Manning and Beach cases, it has been sufficiently shown that Mr. Jimenez and the respondent created by contract a joint tenancy in the bank account. The respondent is, therefore, entitled to the entire balance which was in the account at the time of the deceased's death.

The foregoing disposes of all contentions which the appellant advanced. The decree of the Circuit Court is affirmed. Costs and disbursements will be awarded to neither party.